**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 16-cv-02471-WYD-MJW

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,**

Plaintiff,

**LUCY MARSH,**
**NANCY EHRENREICH,**
**KRIS McDANIEL-MICCIO,**
**CATHERINE SMITH,**
**K.K. DuVIVIER,**
**JOYCE STERLING, and**
**CELIA TAYLOR**

Intervenors,

v.

**UNIVERSITY OF DENVER**,

Defendant.

---

**PLAINTIFFS' MOTION TO COMPEL DOCUMENTS IMPROPERLY WITHHELD BY DEFENDANT UNIVERSITY OF DENVER**

---

Plaintiffs collectively file this motion under Rule 37 of the Federal Rules of Civil Procedure this Motion to Compel Defendant University of Denver ("D.U.") to produce documents described below which have been withheld on privilege grounds. In support of this Motion, Plaintiffs state the following grounds:

## CERTIFICATE OF CONFERRAL

Plaintiffs certify, under Rule 37(a)(5)(A)(i) and D.C.Colo.LCivR 7.1(a), that counsel for Intervenor Prof. Marsh, in good faith but without success conferred with counsel for D.U. in efforts to obtain the documents sought by this Motion without Court action.

## DOCUMENTS AT ISSUE ON THIS MOTION

1. Documents related to D.U.'s retention of and work with Sibson Consulting ("Sibson Materials") (1) which have been improperly withheld on work-product or attorney-client privilege grounds as set forth in D.U.'s privilege logs (attached as **Exh. A** hereto), and (2) which were created prior to November 13, 2013, but not produced, and for which no privilege has been asserted.

Plaintiff EEOC's First and Second Requests for Production, Nos. 6 and 20 respectively, encompass Sibson Materials and are attached, with D.U.'s Responses, as **Exh. B**. Three draft reports, a "project overview," and "Notes Regarding Potential Variables for Compensation," were withheld as work product. **Exh. A**, DU/EEOC 000211-264.

2. The Excel spreadsheet (the "Spreadsheet") relied on by former Dean of the University of Denver Sturm College of Law Martin Katz (" Dean Katz") for his February 2013 salary discussion with Professor Lucy Marsh and later recreated and forwarded to D.U. university counsel Paul Chan.

Plaintiff EEOC's Requests for Productions Nos. 6, 9, 10, and 20 in **Exh. B** encompass document categories to which production of the Spreadsheet would be responsive.

3. Notes, memoranda, and/or reports of Dean Katz's conversations with five former D.U. law deans ("Former Dean Conversations"). Plaintiff EEOC's Requests for Productions

Nos. 6, 8 and 20 encompass categories to which the Former Dean Conversations may be responsive.

## STATEMENT OF FACTS

1. Sibson Materials and the Spreadsheet.

The documents in both of these categories came into existence as a result of the same series of events in 2012 and 2013. Both were created in the ordinary course of D.U. law school business in response to faculty questions about compensation, as follows:

On May 17, 2012, the late law professor Ann Scales ("Prof. Scales") asked Dean Katz "to look into gender equity among faculty salaries," expressly stating that she was "not threatening to bring suit" but only asking him to "please take gender into account." Email from Ann Scales, Prof., Sturm Coll. of Law, to Martin Katz, Dean, Sturm Coll. of Law (May 17, 2012), attached as **Exh. C.** Dean Katz responded on May 23 that he did consider gender equity but to "let me know . . . and I will run an equity analysis." **Exh. C**. Prof. Scales took Dean Katz up on his offer later that day, asking him to "run the numbers [with reliable comparators] on gender equity" not just for her but for "others of the same class (however defined). Look at all of us." She again advised that she was not contemplating suit. **Exh. C.**

On May 31, 2012, professor Kris McDaniel-Miccio ("Prof. McDaniel-Miccio") emailed Dean Katz also asking him to look into "pay equity issues," and requesting "a comparison chart that outlines where I stood in relation to those with the same number of years teaching." Email from Kris McDaniel-Miccio, Prof., Sturm Coll. of Law, to Katz (May 31, 2012), attached as **Exh. D.** Dean Katz responded that he was happy to look into this "and was get[ting] the process started." **Exh. D.**

Dean Katz proceeded during fall semester 2012 with his promised analyses, culminating in a memo sent to all law faculty on December 13, 2012 (the "December memo"), attached as **Exh. E.** Dean Katz there wrote that, in response to Prof. Scales' and others' interest in "gender-based equity considerations," he analyzed salary structure for gender disparities, with the startling finding that the most recent mean salary for female full professors was $15,859 per year less than for males. **Exh. E** at pp. 3-4. Dean Katz concluded that he would be happy to go through an individual "analysis for anyone who would like." *Id.* at p. 4. The analysis would entail looking at comparative starting salaries and annual "merit raises . . . over many years." *Id.*

Prior to distribution of the December memo, Dean Katz had met with D.U. Provost Kvistad (the "Provost") about his findings of pay disparities. Dean Katz testified that "me and the Provost [reached an agreement that] the next step was to do two things. One was to sort of meet with individual faculty members who wanted to look at their pay. And the other was to do the more systemic analysis," which was a reference to hiring Sibson Consulting. Dep. of Martin Katz (Nov. 2, 2017, Dec. 21, 2017), at 249:6-11, attached as **Exh. F**. Dean Katz testified that he and the Provost wanted to take the second step of outside consulting to see if Dean Katz's findings of significant pay disparities between male and female full professors was the result of discrimination, or not. That "was the point of the Sibson analysis." *Id.* at 286:4-9.

In February 2013, Prof. Marsh met with Dean Katz to discuss her pay, as offered in his December memo. At that time, no one on the faculty, Prof. Marsh included, was contemplating any agency or other legal action over pay. In fact, Prof. Marsh had no idea how her pay compared to her peers. No faculty member—neither Prof. Marsh, Prof. Scales, nor Prof. McDaniel-Miccio—had any contact with any D.U. office or office outside the university that

dealt with discrimination. Although its report would not be produced for over a year, consulting with Sibson had been authorized and agreed to by the Provost and Dean Katz well before Dean Katz's February 2013 meeting with Prof. Marsh. *Id.* at 248:17-249:12.

As offered in Dean Katz's December memo, prior to meeting with Prof. Marsh, Dean Katz conducted a comparative analysis of Prof. Marsh's annual "merit raises . . . over many years." **Exh. E** at p. 4. The analysis entailed creating comparative tables of Prof. Marsh's annual percent merit raises versus all other faculty for each year of her employment as a law school professor, back to 1976, which ultimately became the Spreadsheet that is a subject of this Motion. Its purpose was "[to go] back retrospectively . . . to see where [Marsh] falls in terms of her peers, in terms of the percent raise that she got" in each of those years. **Exh. F** at 325:23-327:2. Dean Katz's Spreadsheet data covered raises under nine prior deans. *Id.* at 323:23-324:3. The reason for the Spreadsheet exercise was so he could knowledgably discuss Prof. Marsh's concerns when they met. *Id.* at 324:13-18. The Spreadsheet was created either by Dean Katz or by D.U. Human Resources. *Id.* at 327:19-21. At some later point it was re-created and sent to D.U. University counsel Paul Chan. *Id.*

At the February 2013 meeting, Prof. Marsh was stunned to learn from Dean Katz that she, the longest serving tenured professor, was the lowest paid member of the law school faculty. *Id.* at 19-24. Prof. Marsh asked Dean Katz what he would do about it. Dean Katz testified that in light of the Spreadsheet and, unless there was a significant starting salary difference compared to a colleague, he would do nothing about it. *Id.* at 317:18-319:5. That intransigence combined with Dean Katz and D.U.'s refusal to meet to try to resolve her compensation with Prof. Marsh and attorneys she engaged several months later, led to Prof. Marsh's July 9, 2013 charge with the

EEOC. *Id.* at 319:17-321:19.

When deposed on December 21, 2017, Dean Katz had not looked at the Spreadsheet for perhaps two years, *id.* at 352:13-16, and recalled none of the specific annual data, yet the Spreadsheet remained the sole basis for his opinion that Prof. Marsh's performance in teaching, service, and scholarship under nine prior deans had been "substandard," as stated in an August 31, 2015, press statement sent by D.U. to the university community, alumni, the press, and the public. *Id.* at 213:24-214:11, 323:13-325:10.

While the Provost and Dean Katz had agreed in 2012 to "engag[e] an expert -- I think it was Sibson -- to try to determine whether those differences [in male and female full professor compensation] were related to sex," *id.* at 247:8-10, D.U. has not produced any documentation of Sibson's contacts and retention generated prior to Sibson's formal proposal issued November 13, 2013 (the "November proposal"), attached as **Exh. G**. Regardless of when in 2012 or 2013 Sibson was first contacted about the study, there is nothing to suggest it was for the purpose of the EEOC action or litigation. As stated in the November proposal, the purpose was instead to deliver "recommendations that inform salary setting and increase planning." *Id.* at 5. Dean Katz testified that the lapse of time from the 2012 decision to engage Sibson to the commencement of its work roughly a year later was "administrative slowness," **Exh. F** at 248:22-23, rather than anything related to the EEOC charge.

D.U. has produced the 15-page May 2014 Sibson Final Report (the "May Final Report"), attached as **Exh. H**, and a 15-page April 15, 2014 Sibson Draft Report (the "April Draft"), attached as **Exh. I**, but has withheld as work product three other Sibson draft reports, two 15-page reports also dated April 15, 2014, and one two-page draft report from May 2014, as well as

a December 3, 2013 Project Overview, and a December 20, 2013 "Notes Regarding Potential Variables for Consideration." The reason given for withholding these draft reports while producing one draft report is that the withheld reports "incorporated input from counsel." **Exh. A**

A comparison of the April Draft Report D.U. did produce to the May Final Report demonstrates how important production of all draft reports may be to Plaintiff's case. *Compare* **Exh. H**, pp. 12-13, *with* **Exh. I**, pp. 12-13. The scatter plots on pages 12-13 of the April Draft were broken out by gender—red dots for women, blue dots for men—with separate trend lines and regression line equations for each sex. These pages show a widening gap between male and female trend lines, that the female trend line was well below where it should have been, that only males—ten of them—earned over $153,000 per year, and that four of the five professors whose salaries were below where they should have been were females.

Dean Katz testified, until a work-product objection, that he raised "some questions" about, apparently, these results in the "draft [report] that was circulated at a meeting that included counsel." **Exh. F** at 300:8-22. In the month following the April Draft, the May Final Report was altered to hide all of the gender-specific results of the scatter plots. In the final scatter plots, the red and blue dots are printed without color so that they are all gray, and male and female data points cannot be distinguished. **Exh. H** at pp. 12-13. All trend lines have been removed. *Id.* The regression line equations for men and women are gone. *Id.* In other words, in the final version of this study which Dean Katz claims proves there was no gender discrimination, **Exh. F** at 286:4-9, the results were altered to remove gender from the analysis. The three withheld draft reports may well reveal similar manipulations of data.

2. Former Dean Conversations.

Dean Katz testified that he telephoned all five living former D.U. law deans sometime after Prof. Marsh's July 9, 2013, EEOC charge, and that he made notes or other records of the conversations. According to Dean Katz, he made the calls at the request of counsel. **Exh. F** at 340:14-342:7. Dean Katz would not, on work-product grounds, describe the purpose of the calls. *Id.*

D.U. has promised but not provided a privilege log for documentation of these conversations, though counsel requested one on December 29, 2017.

## ARGUMENT

Pursuant to Fed. R. Civ. P. 26(b)(3)(A), a document is protected by the work-product privilege if it was "prepared in anticipation of litigation . . . by or for another party or its representative . . . ."; *see also Aull v. Cavalcade Pension Plan*, 185 F.R.D. 618, 625 (D. Colo. 1998) (protected documents must also have been intended to remain confidential). The work-product privilege "is intended only to guard against divulging the attorney's strategies and legal impressions . . . ." *Resolution Trust Corp. v. Dabney*, 73 F.3d 262, 266 (10th Cir. 1995); *see also* F.R.C.P. 26(b)(3)(B). However, documents protected by this work-product privilege are nevertheless discoverable if the requesting party can show "substantial need for the materials to prepare its case" and that it cannot obtain equivalent materials without "undue hardship." F.R.C.P. 26(b)(3)(A)(ii).

1. None of the Requested Materials are Work-Product.

As an initial matter, the work-product doctrine does not apply to the documents at issue here, for they were not prepared in anticipation of litigation. A document is prepared in

anticipation of litigation, and is thus protected, if "in light of the nature of the document and the factual situation of the particular case [it] can be fairly said to have been prepared or obtained because of the prospect of litigation." *Martensen v. Koch*, 301 F.R.D. 562, 572-73 (D. Colo. 2014) (citation and quotation omitted). In contrast, documents created in the "ordinary course of business," or those "that would have been created in essentially similar form irrespective of litigation" are not protected. *Id.* at 573 (citation and quotation omitted). Thus, "'[d]etermining whether anticipated litigation is the driving force behind the preparation of each requested document is the central inquiry in resolving work product questions.'" *Smith v. Marten Transp., Ltd.*, No. 10-cv-0293-WYD-KMT, 2010 WL 5313537 at *3 (D. Colo. Dec. 17, 2010) (quoting *Wikel v. Wal-Mart Stores, Inc.*, 197 F.R.D. 493, 495-96 (N.D. Okla. 2000). Moreover, even after litigation begins, the work-product doctrine "applies . . . to protect only those documents created because of the litigation [since] the ordinary course of business does not end with the commencement of litigation." *Quality Time, Inc. v. West Bend Mutual Insurance Company*, No. 12-1008-JTM-GLR, 2012 U.S. Dist. LEXIS 161703 (D. Kan., Nov. 13, 2012). The party raising the work-product privilege has the burden of proving the privilege applies. *Resolution Trust Corp. v. Heiserman*, 151 F.R.D. 367, 373 (D. Colo. 1993) (citing *Peat, Marwich, Mitchell & Co. v. West*, 748 F.2d 540, 542 (10th Cir. 1984)).

Under this standard, D.U. cannot meet its burden of showing that the Sibson Materials or the Spreadsheet are work-product. The driving forces for consulting Sibson were Professors Scales and McDaniel-Miccio's raising pay equity issues with Dean Katz in 2012, which Dean Katz took to the Provost as part of their administrative duties. Likewise, Dean Katz created the Spreadsheet as part of his supervisory duties over Prof. Marsh, for purposes of his February 2013

meeting with her to discuss her pay. No one anticipated litigation as these events were unfolding, and, though Sibson's work apparently did not get underway until Fall 2013, the "driving force" behind its research and reports were the 2012 pay inquiries. The consulting approved by the Provost in 2012 that brought about Sibson's work would have come about regardless of the subsequent EEOC litigation and would have been produced in much the same form.

Moreover, Sibson's work was driven by the law dean and provost, not litigation counsel, or even university counsel. Though Dean Katz is a lawyer, his role in procuring consulting with Sibson was as a manager, as was the Provost's. It is immaterial that university counsel may have attended meetings about Sibson reports, or even provided input that Sibson incorporated. The Sibson consultants were certainly not lawyers, and D.U. legal office input incorporated into a non-work-product document does not turn it into work-product. *See South Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 257 F.R.D. 607, 614 (E.D. Cal. 2009).

The Spreadsheet is an especially clear-cut case, created as it was for a dean-professor conference long before the EEOC charge or any possible question of litigation. It would also appear that D.U. cannot meet its burden of proving the Former Dean Conversations were work-product because, though law deans are lawyers, they were acting in these dean-to-dean conversations as higher education administrators rather than as litigation counsel.

The withheld documents, accordingly are not work-product and should be produced. *See, e.g., Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 668 (10th Cir. 2006) (holding work-product privilege inapplicable to letter authored by a party to the case where the party drafted the letter more than a year prior to the start of litigation and "insist[ed] that he had

no role in the decision to proceed with [the] litigation").

2. Even if the Documents at Issue are Work-Product, They Are Nevertheless Discoverable.

Even if this Court were to determine that the documents are work-product, they are factual work-product for which Plaintiffs have a substantial need, rendering them discoverable. "Rule 26(b)(3) distinguishes between factual work-product and mental impressions," affording a higher degree of protection to the latter. *Heiserman*, 151 F.R.D. at 373. "Factual work-product, unlike mental impressions, is discoverable upon a showing that (a) the party seeking discovery has substantial need for the materials in the preparation of his case; and (b) he is unable without undue hardship to obtain the substantial equivalent of the materials by other means." *Id.* (citing F.R.C.P. 26(b)(3); *U.S. ex rel. Stone v. Rockwell Intern. Corp.*, 144 F.R.D. 396 (D. Colo. 1992)). A party demonstrates a substantial need for documents where the documents are essential to an element of the case or where they carry great probative weight on contested issues. *Martensen*, 301 F.R.D. at 580.

In this case, these documents concern salary studies, salary data, and notes about conversations between former law school deans—precisely the sort of factual work-product that is discoverable in proper circumstances.

D.U. has invoked these various documents on several occasions as "proving" its side of the story. For example, Dean Katz testified that the Sibson report proved D.U. did not discriminate against female faculty in pay. **Exh. F** at 286:4-9. Likewise, Dean Katz claims that the Spreadsheet proved that Prof. Marsh has been a substandard teacher and scholar throughout her career in defense of her being paid substantially less than many of her colleagues. *Id.* at 213:25-214:11. Plaintiff has a clear substantial need for full document production to be able to

confront these assertions.

There are also no substitutes for the data contained in any of the documents that can be obtained without undue burden. The various Sibson materials are unique, as are the Former Dean Conversations, and, to date, D.U. has refused to testify as to the substance of the withheld documents. Dean Katz testified that the data for the Spreadsheet "is in the documents you have," *id.* at 326:17-18, but it is not. The Spreadsheet in fact cannot be reproduced from data provided to Plaintiff by D.U., at least not without significant time and expense and the risk of ending up with a tabulation Dean Katz would disavow.

D.U. counsel has stated that D.U. has looked for but cannot locate the Spreadsheet. Dean Katz, however, testified of the Spreadsheet data, "[w]e had it . . . it's just a spreadsheet exercise. It's not a Herculean task [to reproduce it]." *Id.* at 326:17-22.

Given the centrality of these documents to the issues in this case, and the inability to reproduce them from other sources, Plaintiffs are entitled to their production.

3. <u>Work-Product Protection for All Documents at Issue Has Been Waived</u>.

Additionally, by relying on the contents of these documents to support its defenses, D.U. has waived any work-product privilege. "Both the attorney-client privilege and work product privilege may be waived if a party puts the privileged communications at issue by relying on it to support a claim or defense." *Martensen*, 301 F.R.D. at 580-81. Significantly, "a litigant cannot use the work product as both a sword and shield by selectively using the privileged documents to prove a point but then invoking the privilege to prevent an opponent from challenging the assertion." *Frontier Refining, Inc. v. Gorman-Rupp Co., Inc.*, 136 F.3d 695, 704 (10th Cir. 1998).

As stated above, D.U. has routinely relied on the contents of these documents to support its case, waiving any privilege that may have attached to them. Dean Katz has testified about the Spreadsheet's data and content, how and why it was assembled, and about his opinions the Spreadsheet allegedly supports, and that it supports the press statements that Prof. Marsh's career was consistently "substandard." He is thus both testifying as to the significance of the Spreadsheet, using it as a sword, while at the same time using the work-product privilege to shield it from production. The Sibson Materials have likewise been used as a sword, cited as the bases for multiple D.U. faculty memoranda and press statements, as well as Dean Katz's opinions that there is no gender discrimination in pay at the law school. The Sibson draft reports as well as all information Sibson considered, including communications from D.U. counsel and questions by Dean Katz, are not shielded from discovery by the work product privilege.

Finally, D.U.'s failure to produce a privilege log for the Spreadsheet and the Former Dean Conversations should result in waivers of work-product protection. *See Atteberry v. Longmont United Hosp.*, 221 F.R.D. 644, 648-49 (D. Colo. 2004).

4. Production of Sibson Materials Improperly Withheld on Attorney-Client Privilege Grounds or Simply Not Provided Should be Compelled.

D.U. has also withheld redacted portions of 53 pages of Sibson Materials on attorney-client privilege grounds when the large majority do not appear to have been communications between attorney and client. *See* **Exh. A**. In addition, no Sibson documents or communications prior to the November proposal, such as initial contacts, letter of engagement, contracts, etc., have been produced, though they surely exist and are discoverable. *See Aull*, 185 F.R.D. at 625 ("A document is protected by the attorney client privilege if it reveals a communication between a client and an attorney, made in order to obtain or deliver legal assistance, that was intended to

be treated as confidential.") (citation omitted).

**CONCLUSION**

Plaintiffs respectfully request an Order that D.U. produce forthwith,

1. All Sibson Materials withheld on work-product grounds and those withheld on attorney-client privilege grounds paginated DU-EEOC 031186 - 205, 000047 - 66, 0000 84 -95, and 020083 - 89;

2. Complete compliance with Plaintiffs' Requests for Production of all Sibson Materials from initial contact with D.U. forward;

3. The Katz Spreadsheet; and

4. Notes and other records of the Former Deans Conversations.

Plaintiffs further request, under Fed. R. Civ. P. Rule 37(a)(5), an Order that D.U. pay Plaintiffs' expenses and fees incurred on this Motion; and such other and further relief as the Court deems warranted.

Dated: January 16, 2018

Respectfully submitted,

*s/Baine P. Kerr*

Baine P. Kerr
Hutchinson Black and Cook, LLC
921 Walnut Street, Suite 200
Boulder, CO 80302
Telephone: 303-442-6514
Facsimile: 303-442-6593
kerr@hbcboulder.com
*Attorneys for Plaintiff Intervenor Lucy Marsh*

## *C*ERTIFICATE OF SERVICE

I hereby certify that on January 16, 2018, a true and correct copy of the foregoing **PLAINTIFF'S MOTION TO COMPEL DOCUMENTS IMPROPERLY WITHHELD BY DEFENDANT UNIVERSITY OF DENVER** was served by CM/ECF system on the following:

Michael Imdieke
Equal Employment Opportunity Commission
Denver Field Office
303 East 17th Avenue, Suite 410
Denver, Colorado 80203
Telephone: (303) 866-1320
Facsimile: (303) 866-1375
michael.imdieke@eeoc.gov

Charlotte N. Sweeney
Joan M. Bechtold
Ariel B. DeFazio
Sweeney & Bechtold, LLC
650 S. Cherry St., Suite 700
Denver, CO 80246
Telephone: 303-865-3733
Facsimile: 303-865-3738
cnsweeney@sweeneybechtold.com
jmbechtold@sweeneybechtold.com
abdefazio@sweeneybechtold.com

*Attorneys for Plaintiff Intervenors Ehrenreich, McDaniel-Miccio, Smith, DuVivier and Sterling*

Jim Goh
Steven W. Moore
LaLonnie Gray
600 17th Street, Suite 2700S
Denver, CO 80202
Telephone: 720-343-7533
Facsimile: 720-343-7571
jgoh@constangy.com
smoore@constangy.com
lgray@constangy.com

*Attorneys for Defendant*

Jennifer Reisch
Equal Rights Advocates
jreisch@equalrights.org

*s/Marlene Diamond*

NOTE: Exhibits G, H and I to the Motion to Compel are confidential and are being filed separately under Level 1 restriction.